## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Robert Podgorny and Kevin P. Cauley,

                Plaintiffs,

      v.

CVS Health Corporation,

                Defendant.

Civil No. _____

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

       Plaintiffs Robert Podgorny and Kevin P. Cauley, individually and on behalf of a class of all those similarly situated, bring this consumer fraud action for damages and injunctive relief under the statutory and common laws of certain states against defendant CVS Health Corporation, and allege based upon the investigation of counsel and upon information and belief as follows:

## I.      INTRODUCTION

       1.     This action alleges a common fraudulent and deceptive pricing scheme by CVS to overcharge customers with third-party health care plans on purchases of generic prescription drugs at CVS pharmacies.

       2.     CVS calls itself an integrated pharmacy health care company.  It currently operates more than 7,800 retail pharmacies in the United States and Puerto Rico, nearly 1,000 walk-in medical clinics, and a pharmacy benefits manager with more than 70 million plan members.  CVS fills more than 1.7 billion prescriptions a year, has more than five million pharmacy customers a day, and has captured a third of total prescription growth in the United States since 2008.

       3.     In June 2015, CVS announced that it will be acquiring and operating all of Target Corporation's in-store pharmacies, which will add more than 1,650 additional pharmacies to CVS'

pharmacy business. When the Target acquisition is completed later this year, CVS will have more retail pharmacies in the United States than any other company. In 2014, CVS' retail pharmacy business generated more than $67 billion in revenues, 70% of which came from prescription drugs.

4.      This action concerns CVS' pricing of generic prescription drugs. A generic drug is a copy of a brand-name drug. By law, generic drugs must have the same active ingredients as the brands they copy. Generics must be the same strength and work the same way as the brand-name drug. Generics typically cost less than brand-name drugs and, because of this cost savings, many third-party health plans give members a lower co-pay if they agree to use available generic drugs as a cost-savings incentive. According to the IMS Institute for Healthcare Informatics, approximately 86% of all prescriptions filled in the United States are for generic drugs.

5.      About 90% of all United States citizens are now enrolled in a private or public health care plan that covers some or all medical and pharmaceutical expenses. A feature of most of these plans is the shared cost of prescription drugs. When a plan participant fills a prescription under a third-party health care plan, the plan pays a portion of the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or copay. CVS pharmacies collect the copay from the plan participant at the time the prescription is filled. The amount of the copay cannot exceed the usual and customary price that CVS charges for the drug. The usual and customary price is the price CVS would charge a customer paying cash and without any insurance.

6.      The process by which CVS determines the amount of any customer's copay is performed electronically at the time a prescription is filled. CVS will submit an electronic claim for payment to the customer's health plan in which it states what CVS' usual and customary price is for the drug being prescribed. The plan will then determine, based on the usual and customary

2

price provided by CVS, what the appropriate copay amount is for each particular customer and prescription.

7.      Beginning in 2006, CVS began facing significant competition from large retailers with in-house pharmacies, such as Wal-Mart and Target, which had begun selling hundreds of popular generic prescription drugs at very low prices.  CVS wanted to compete with the large retailers, but without imperiling its highly profitable prescription drug business.  CVS accomplished this dual goal by first creating a discounted generic prescription drug program for cash-paying uninsured customers (the Health Savings Pass or HSP program) in November 2008. Included within the program were about 400 generic prescription drugs, most of which were available for around $11 for a 3 month supply.  The generic prescription drugs included within the HSP program are set forth on Exhibit 1.

8.      For these 400 or so generic prescription drugs, the prices charged by CVS on Exhibit 1 should have become CVS' usual and customary price, because that was the price CVS charged for cash customers not paying with insurance.  This is consistent with industry practice and CVS' public statements.  CVS' own website specifically represents that the "usual and customary (price)" is "[t]he price an individual would pay for a prescription at a retail pharmacy if they did not have a prescription drug benefit."

9.      But, CVS did not and currently does not consider prices charged in the HSP program when setting its usual and customary prices for these generic prescription drugs when they are sold to customers covered in whole or in part by a third-party health plan.  Instead, CVS submits knowingly and intentionally falsely inflated "usual and customary prices" to third-party health plans and overcharges customers paying for generic prescription drugs with insurance and a copay.

10. In financial terms, the impact of CVS' fraudulent and deceptive scheme to third-party health plans and insured customers that purchase generic prescription drugs using copays is significant. The third-party plans do not have the information needed to assess whether the usual and customary prices reported by CVS are accurate, and so must calculate and allocate costs and the customer's copay based on the artificially-inflated retail price for the generic prescription drugs reported by CVS. And the customers who purchase the drugs from CVS using their health plan benefits pay significantly more as a copay for their generic prescription drugs than uninsured customers who pay cash would for the very same prescription.

11. As a result of CVS' fraudulent and deceptive pricing scheme, plaintiffs and the other members of the class and subclasses described below were overcharged by CVS for the generic prescription drugs set forth on Exhibit 1 from approximately November 2008 to the present (the "Class Period"). CVS' scheme has caused plaintiffs and the other members of the class and subclasses to suffer significant damages.

## II.     PARTIES

### A.     Plaintiffs

12. Plaintiff Robert Podgorny resides in the State of Illinois. During the Class Period, Mr. Podgorny purchased generic versions of two monthly maintenance medications from CVS that were prescribed to Mr. Podgorny and are on Exhibit 1. Mr. Podgorny has carried private health insurance throughout this period, and as a result of the fraudulent scheme, he has paid co-pays substantially higher than $11.99 per 90-day supply each time he purchased his generic drugs from CVS, and has been damaged thereby.

13. Plaintiff Kevin P. Cauley resides in the Commonwealth of Pennsylvania. During the Class Period, Mr. Cauley purchased a generic version of a monthly maintenance medication

from CVS that was prescribed to Mr. Cauley and is on Exhibit 1. Mr. Cauley has carried private health insurance throughout this period, and as a result of the fraudulent scheme, he has paid co-pays substantially higher than 11.99 per 90-day supply each time he purchased his generic drug from CVS, and has been damaged there

**B.     Defendant**

14.     Defendant CVS is a Delaware corporation headquartered at One CVS Drive, Woonsocket, Rhode Island, 02895. CVS also does business as CVS/Caremark, CVS/Pharmacy, CVS/Minute Clinic and CVS/Specialty. Its retail pharmacies operate as CVS Pharmacy and Longs Drugs in the Unites States and Puerto Rico.

### III.     JURISDICTION AND VENUE

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1367(a) and the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2). This is a class action filed under Fed. R. Civ. P. 23 that includes claims asserted on behalf of a nationwide class. There are likely millions of proposed class members and the aggregate amount in controversy exceeds $5 million. Finally, CVS is a citizen of a state different from that of plaintiffs and members of the proposed class.

16.     This Court has jurisdiction over CVS because CVS regularly conducts business in Illinois through the promotion, sale, marketing, and distribution of their products to Illinois residents. CVS owns and operates more than 275 pharmacies and 45 clinics in Illinois. As a result, jurisdiction in this Court is proper and necessary. CVS' wrongful conduct also foreseeably affects consumers in Illinois and nationwide.

17.     Venue is proper in this District under 28 U.S.C. § 1391 (a)–(d) because substantial parts of the events or omissions giving rise to the claim occurred in the District and/or a substantial part of property that is the subject of the action is situated in the District.

## IV.    FACTS

### A.    Usual and Customary Prescription Drug Pricing

18.    According to the United States Government Accountability Office, the usual and customary price for a prescription drug is the price an uninsured individual would pay for that drug at a retail pharmacy.  The usual and customary price is important, though, for virtually all of CVS' prescription drug customers because even for customers insured through a third-party health plan, the usual and customary price still serves as the price for the drug that is charged to the health plan and, necessarily, impacts the amount of the copay that an insured customer will pay.

19.    Since at least November 2008, though, CVS has not been charging insured customers the usual and customary price for more than 400 popular generic prescription drugs sold at CVS retail pharmacies throughout the United States.  Instead, it has charged a grossly inflated price for those particular drugs, resulting in insured customers paying more as an insurance copayment for their prescriptions than an uninsured customer would pay for the very same prescription.

### B.    The Prescription Drug Copay System

20.    About 90% of all United States citizens are now enrolled in a private or public health care plan that covers some or all medical and pharmaceutical expenses.  A feature of most of these plans is the shared cost of prescription drugs.  When a plan participant fills a prescription under a third-party health care plan, the plan pays a portion of the cost, and the plan participant pays the remaining portion of the cost directly to the pharmacy in the form of a copayment or copay.

21.    Plaintiffs and all members of the Class and Subclasses described below at all relevant times have been insured through a third-party health plan. As health plan participants,

plaintiffs and the other members of the Class and Subclasses pay premiums, either directly or through employment, to a third-party health plan to insure against healthcare and prescription drug costs.

22. Because plaintiffs and the other members of the Class and Subclasses are insured through health plans, they reasonably expect to pay the same prices as uninsured or cash-paying individuals for a prescription. If it were otherwise, plaintiffs and the other members of the Class and Subclasses would not only receive no benefit from their insurance, but would, in fact, be punished for having insurance. In light of the large number of health plans negotiating the prices of prescription drugs on their behalf and the premiums paid for coverage, plaintiffs and the other members of the Class and Subclasses also reasonably expect to pay even less than cash-paying customers who do not have insurance coverage.

**C.    The Industry Standard Submission Process Mandates Truthful Reporting of Usual and Customary Drug Prices**

23. The process by which a drug prescription is filled is the same at all CVS pharmacies in the United States and Puerto Rico. A CVS employee enters the prescription information and any applicable insurance or benefit information into CVS' centralized claims processing system. Once entered, the claim is submitted for dispensing to the customer and adjudication by the customer's third-party health plan, if the customer is insured.

24. CVS submits prescription claims electronically in real time to third-party health plans. Each claim is automatically verified and/or confirmed for patient eligibility for insurance or another prescription drug benefit. Once verified, the third-party health plan will use the usual and customary price provided by CVS to set the reimbursement amount to CVS and the copay that will be paid by the insured consumer.

25.     The claims submission process used by CVS to fill drug prescriptions is an industry standard developed by the National Council for Prescription Drug Programs (NCPDP), a non-profit forum that creates national standards for the real-time, electronic exchange of healthcare information, with a primary focus on prescription information.

26.     As a part of this industry standard process, the price reported by CVS to a third-party health plan is required to be the usual and customary price for the drug being dispensed.

27.     Using the information provided by CVS, the third-party health plan will determine the amount of the copay based on the price of the drug and the particulars of the customer's insurance plan. The copay is to represent only a portion of the total drug price and cannot exceed the drug price. The remainder of the drug price is to be paid to CVS by the third-party health plan.

**D.     CVS' Deceptive Prescription Drug Pricing Scheme**

28.     Beginning in 2006, CVS began facing significant competition from large retailers with in-house pharmacies, such as Wal-Mart and Target, which had begun selling hundreds of popular generic prescription drugs at very low prices.  These other retailers were able to offer low prices, and absorb lower margins, on generic prescription drug sales because pharmacy sales represented a relatively low percentage of total sales.

29.     CVS, whose pharmacy business is the primary business of the company, was unwilling to match the deep discounts on generic prescription drugs provided to customers by the large retailers.

30.     Instead, in response to lower prices and increased competition for cash customers, CVS created the HSP program, which it launched in November 2008.  The 400 or so generic prescription drugs included in the HSP program are among some of the most commonly prescribed generic drugs for cardiovascular, allergy, diabetes, pain, and arthritis, cholesterol, skin conditions,

mental health, women's health, viruses, thyroid conditions, glaucoma and eye care, gastrointestinal disorders, and other common ailments.

31.     The HSP program is intended to and does allow CVS to compete with the large retailers for generic prescription drug sales to uninsured cash customers, while still maximizing reimbursements and copayments through reporting artificially inflated usual and customary prices to third-party health plans.

32.     Many of the third-party health plans doing business with CVS have negotiated prices for a number of popularly prescribed drugs.  The agreements between the third-party health plans and CVS typically allow CVS only to be compensated for the lesser amount.  In other words, if the negotiated price for a certain drug is less than CVS' usual and customary price, then the negotiated price is used to calculate payment to CVS and the amount of the customer's copay. Conversely, if CVS' usual and customary price is lower, than that price is used instead of the negotiated price.

33.     All third-party health plans that provide coverage for prescription drug costs specify how the copay is determined. Many of the third-party health plans specifically contemplate a situation where the usual and customary price is less than the copay. In these instances, the third-party health plans prohibit the pharmacy from charging the insured customer a copay that is more than the pharmacy's usual and customary price.  And because CVS is part of the adjudication process each time a prescription is filled for an insured customer, CVS must know that it cannot charge an insured customer a copay that is more than the pharmacy's usual and customary price.

34.     CVS used and uses the HSP program as a scheme to create a supposedly new category of cash customer for generic prescription drugs.

35.     Uninsured CVS customers who purchase prescription drugs outside of the HSP program and pay the retail price make up less than 50% of CVS' cash business and less than 3% of CVS' total prescription drug business.  Put more simply, most of CVS' cash-paying uninsured customers pay the HSP price.

36.     The industry standards that CVS follows provide that the usual and customary price is the cash price offered to the general public for a prescription drug.  CVS understands this:  its website specifically defines the term "usual and customary (price)" as "[t]he price an individual would pay for a prescription at a retail pharmacy if they did not have a prescription drug benefit."[1] CVS offers the HSP price as the cash price to the general public and the HSP price is, in fact, the most common price paid by CVS' cash-paying customers.  Thus, under the industry standards CVS follows, and CVS' own definition, the HSP price is the "usual and customary price" for each generic prescription drug that is identified on Exhibit 1.

37.     Nonetheless, CVS continues to submit not the HSP price but the non-discounted, full retail price as its purported "usual and customary price" to third-party health plans. CVS can do so because the third-party health plans are not privy to what prices CVS charges its uninsured cash customers, including its HSP customers, and what percentage of CVS' cash customers pay each price. Thus, third-party health plans and insured CVS customers have no way of determining on their own whether the price CVS submits as its usual and customary price is, in fact, the most common price offered to cash paying members of the general public.

38.     This deceptive pricing scheme has been an enormous financial success for CVS. Since 2008, CVS has collected more than $46 billion in copays from insured customers, including plaintiffs and other members of the Class and Subclasses.  And CVS has, since 2008, been able to

---

[1]  https://www.caremark.com/wps/portal/!ut/p/c4/04_SB8K8xLLM9MSSzPy8xBz9CP0os3gnC3NzC-8gw1CX0ABnA08zvzDjMHM_Q_cAE_2CbEdFADV5_0o!/ (last accessed on Sept. 16, 2015).

capture fully a third of the total growth in the sale of prescription drugs in the United States. On information and belief, CVS' wrongful overcharges to plaintiffs and the other members of the Class and Subclasses comprise a meaningful portion of CVS' generic prescription drug copay revenue.

39.     By reporting false generic prescription drug prices to the third-party health plans, CVS has caused plaintiffs and the other members of the Class and Subclasses described below to pay, and continue to pay, to CVS, artificially high copayments for the generic prescription drugs set forth on Exhibit 1.

**E.     Plaintiffs Paid Significant Overcharges for Prescribed Generic Drugs**

40.     Plaintiff Podgorny is a resident of the State of Illinois. Mr. Podgorny has purchased generic versions of two prescribed maintenance medications at CVS pharmacies located in Chicago, Illinois between November 2008 and the present. Mr. Podgorny carries private health insurance and carried private health insurance during the time that he purchased generic medications from CVS. The two medications prescribed to Mr. Podgorny appear on the CVS generic medication list (Exhibit 1 hereto). Non-insured, cash paying customers paid $9.99 for a 90-day supply of the same medications prescribed to and purchased by Mr. Podgorny from 2008 to 2010, and $11.99 for a 90-day supply of the same medications starting in 2011. CVS is required to but has failed to charge Mr. Podgorny a copay that does not exceed the usual and customary price of $9.99 (from 2008 to 2010) or $11.99 (from 2011 to the present) for a 90-day supply of these prescribed medications. As a result of CVS' unlawful scheme, Mr. Podgorny has throughout the class period paid copays substantially higher than the usual and customary price of $9.99 or $11.99 per 90-day supply of these medications. For example, during 2014 and 2015, Mr. Podgorny

paid to CVS copays of $22.07 for a 90-day supply of one medication, and $17.11 for a 90-day supply of the second medication.

41.     Plaintiff Cauley is a resident of the State of Pennsylvania. Mr. Cauley has purchased generic versions of a prescribed monthly maintenance medication at CVS pharmacies located in Philadelphia, Pennsylvania between November 2008 and the present.  Mr. Cauley carries private health insurance and carried private health insurance during the time that he purchased this prescribed generic medication from CVS.  The medication prescribed to Mr. Cauley appears on the CVS generic medication list (Exhibit 1 hereto).  Non-insured, cash paying customers paid $9.99 for a 90-day supply of the same medication prescribed to and purchased by Mr. Cauley from 2008 to 2010, and $11.99 for a 90-day supply of the same medication starting in 2011.  CVS is required to but has failed to charge Mr. Cauley a copay that does not exceed the usual and customary price of $9.99 (from 2008 to 2010) or $11.99 (from 2011 to the present) for a 90-day supply of this prescribed medication.  As a result of CVS' unlawful scheme, Mr. Podgorny has throughout the class period paid copays substantially higher than the usual and customary price of $9.99 or $11.99 per 90-day supply of his prescribed generic medication.  For example, during 2014 and 2015, Mr. Cauley paid to CVS copays of $43.75 for one-month supplies of this medication.

42.     As a result of its common fraudulent scheme as alleged herein, CVS has overcharged and continues to overcharge hundreds of thousands of its insured customers (including plaintiffs and the other members of the Class and Subclasses) who have purchased some of the most commonly prescribed generic prescription drugs from CVS pharmacies located throughout the United States.

**V.      CLASS ALLEGATIONS**

43. Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(3), on behalf of themselves and the following national class and state subclasses:

**NATIONAL CLASS**

All CVS customers in the United States who, between November 2008 and the present, (i) purchased a generic prescription drug listed on Exhibit 1; (ii) were insured for the purchase through a third-party health plan; and (iii) paid CVS an out-of-pocket copayment for the purchase that was more than the price charged for the drug as set forth on Exhibit 1.

**STATE SUBCLASSES**

**Illinois Subclass:**

All CVS customers in the State of Illinois who, between November 2008 and the present, (i) purchased a generic prescription drug listed on Exhibit 1; (ii) were insured for the purchase through a third-party health plan; and (iii) paid CVS an out-of-pocket copayment for the purchase that was more than the price charged for the drug as set forth on Exhibit 1.

**Pennsylvania Subclass:**

All CVS customers in the Commonwealth of Pennsylvania who, between November 2008 and the present, (i) purchased a generic prescription drug listed on Exhibit 1; (ii) were insured for the purchase through a third-party health plan; and (iii) paid CVS an out-of-pocket copayment for the purchase that was more than the price charged for the drug as set forth on Exhibit 1.

44. Excluded from the foregoing Class and Subclasses are CVS and its officers and directors.

45. The Class and Subclasses consist of millions of CVS customers, making joinder impractical. The exact size of the Class and Subclasses and the identities of the individual members thereof are easily ascertainable through CVS' records, including but not limited to their billing and collection records.

46. Plaintiffs' claims are typical of the Class and Subclasses. The claims are based on the same legal theories and arise from the same unlawful and willful conduct, resulting in the same injury to the plaintiffs and their respective classes.

47. The respective classes have a well-defined community of interest. CVS has acted and failed to act on grounds generally applicable to the plaintiffs and the Class and Subclasses, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the respective classes.

48. There are many questions of law and fact common to the claims of plaintiffs and the Class and Subclasses, and those questions predominate over any questions that may affect only individual class members within the meaning of Fed. R. Civ. P. 23(a)(2) and 23(b)(2).

49. Common questions of fact and law affecting members of the Class and Subclasses include, but are not limited to, the following:

a. Whether CVS artificially inflated the usual and customary prices that it reported to third-party health plans and customers for the generic prescription drugs set forth on Exhibit 1;

b. Whether CVS omitted and concealed material facts from its communications and disclosures regarding its generic prescription drug pricing scheme;

c. Whether CVS has overcharged and continues to overcharge copays to plaintiffs and class members who purchased some of the most commonly prescribed generic drugs from CVS;

d. Whether CVS has engaged in fraud, unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in connection with the pricing and sale of the generic prescription drugs set forth on Exhibit 1;

e. Whether, as a result of CVS' conduct, plaintiffs and the Class and Subclasses have suffered damages, and, if so, the appropriate measure of damages to which they are entitled; and

14

f.     Whether, as a result of CVS' misconduct, plaintiffs and the Class and Subclasses are entitled to injunctive, equitable and/or other relief, and, if so, the nature of such relief.

50.     Absent a class action, most of the members of the Class and Subclasses would find the cost of litigating their claims to be prohibitive and will have no effective remedy. The class treatment of common questions of law and fact is also superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants and promotes consistency and efficiency of adjudication.

51.     Plaintiffs will fairly and adequately represent and protect the interests of the Class and Subclasses. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other respective class members, and have the financial resources to do so. Neither Plaintiffs nor their counsel have any interests adverse to those of the other members of the Class and Subclasses.

## VI.     TOLLING OF THE STATUTE OF LIMITATIONS

52.     Plaintiffs and the Class and Subclasses had neither actual nor constructive knowledge of the facts constituting their claims for relief until recently.

53.     Plaintiffs and members of the Classes did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the unlawful conduct alleged herein until recently.

54.     CVS engaged in a secret scheme that did not reveal facts that would have put plaintiffs or the Class or Subclasses on inquiry notice that CVS was charging inflated prices for generic prescription drugs.

55.     Because CVS' scheme was kept secret, plaintiffs and the Class and Subclasses were unaware of CVS' unlawful conduct alleged herein and did not know that they were paying artificially inflated prices for generic prescription drugs in the United States during the Class Period.

56.     CVS actively misled the public about its pricing scheme by not disclosing to plaintiffs and the Class and Subclasses that the usual and customary prices reported to third-party health plans for the generic prescription drugs on Exhibit 1 were far higher than the prices CVS charged to uninsured customers paying cash for the same drugs.  CVS charged plaintiffs and the Class and Subclasses copays for the drugs they purchased that reflected CVS' artificially inflated prices.  CVS also failed to post drug prices in a clear manner and in a way that would alert plaintiffs and the Class and Subclasses to the artificially inflated prices charged by CVS.  By so doing, CVS misled plaintiffs and the Class and Subclasses into paying to CVS inflated copays for these drugs.

57.     CVS' affirmative acts alleged herein, including acts in furtherance of its unlawful scheme, were wrongfully concealed and carried out in a manner that precluded detection.

58.     CVS' unlawful pricing activities were inherently self-concealing because they involved misrepresenting and falsely reporting the usual and customary price. If CVS had been open about its fraudulent pricing scheme, it would never have succeeded.

59.      Plaintiffs and the Class and Subclasses could not have discovered the alleged unlawful activities at an earlier date by the exercise of reasonable diligence because CVS employed deceptive practices and techniques of secrecy to avoid detection of its activities. CVS fraudulently concealed its activities by various means and methods, including misrepresentations regarding the real prices of the generic prescription drugs on Exhibit 1.

60.     Because CVS affirmatively concealed its scheme, Plaintiffs and the Class and Subclasses had no knowledge until recently of the alleged fraudulent activities or information which would have caused a reasonably diligent person to investigate whether CVS committed the actionable activities detailed herein.

61.     As a result of CVS' fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that plaintiffs and the Class and Subclasses have as a result of the unlawful conduct alleged in this complaint.

## COUNT I
## VIOLATION OF THE RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### (R.I. G.L. § 6-13.1-1 *et seq.*)
### Asserted by Plaintiffs and the Class against CVS

62.     Plaintiffs repeat paragraphs 1 through 61 above.

63.     This count is brought against CVS, which is headquartered in and maintains its principal place of business in the State of Rhode Island, on behalf of plaintiffs and the Class pursuant to the Rhode Island Deceptive Trade Practices Act ("DPTA"), R.I. G.I., § 6-13.1-1 *et seq.* *See Faherty et al. v. CVS Pharmacy Inc.,* 2010 WL 1930573, *2 (D. MA, May 12, 2012) (holding that class members residing outside of Rhode Island may pursue DPTA claims against Rhode Island-based CVS Pharmacy, Inc.); *Park v. Ford Motor Co.*, 844 A.2d 687, 690 (R.I. 2004) (allowing a nationwide class to maintain claims against a Rhode Island company under the DTPA, regardless of where a customer resided or suffered injury).

64.     R.I. G.I. § 6-13.1-2 prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" and declares such practices unlawful.

65.     R.I. G.I. § 6-13.1-5 provides a private remedy and permits "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and

thereby suffers any ascertainable loss of money, property, real or personal, as a result of the use or employment of another person of a method, act or practice declared unlawful by § 6-13.1-2" to bring an action, including a class action, for damages and injunctive relief.

66.     Plaintiffs and other members of the Class are "persons" within the meaning of R.I. G.I. § 6-13.1-1(3), which includes "natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations, and any other legal entity.

67.     "Trade" and "commerce" is defined in R.I. G.I. § 6-13.1-1(5) as "advertising, offering for sale, sale, or distribution or any services and any property, tangible or intangible, real, personal, or mixed, and any other article, commodity or thing of value, wherever situate, and include[s] any trade or commerce directly or indirectly affecting the people of" the State of Rhode Island.

68.     CVS has unfairly obtained monies from plaintiffs and other members of the Class through CVS' unfair or deceptive acts or practices (including violations of R.I. G.I. § 6-3.1-1(6)(iii), (xi), (xii), (xiii)), including among other things:

(a)     reporting to third-party health plans fraudulent usual and customary prices for the hundreds of generic prescription drugs set forth on Exhibit 1;

(b)     misrepresenting to third-party health plans, plaintiffs and the Class that the usual and customary price was greater than their copayments;

(c)     concealing from plaintiffs and the Class the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1; and

(d)     wrongfully obtaining monies from plaintiffs and the Class as a result of its deception.

18

69. CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive.

70. The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to plaintiffs' and the Class' decisions about whether to purchase generic prescription drugs from CVS, in that plaintiffs and Class members would not have purchased generic prescription drugs from CVS for more than the usual and customary prices set forth on Exhibit 1, but for CVS' unfair and/or deceptive acts and/or practices.

71. As a direct and proximate result of CVS' unfair and deceptive acts and practices, plaintiffs and Class members were deceived into paying falsely inflated prices for the generic prescription drugs set forth on Exhibit 1 and have been damaged thereby.

## COUNT II
## FRAUD
### Asserted by Plaintiffs and the Class against CVS

72. Plaintiffs repeat paragraphs 1 through 61 above.

73. CVS materially misrepresented and/or concealed the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations and/or omissions by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

74. CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party health plans were substantially and unjustifiably higher than the prices CVS charged for the same drugs for uninsured cash customers.

75.     CVS intended to induce plaintiffs and Class members to rely on its misrepresentations and/or omissions. CVS knew that plaintiffs and Class members would rely on CVS' representation and/or omissions regarding usual and customary prices, and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs set forth on Exhibit 1.

76.     Plaintiffs and Class members justifiably relied upon CVS' misrepresentations and/or omissions in that plaintiffs and Class members would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Plaintiffs' and Class members' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

77.     As a proximate result of CVS' conduct, plaintiffs and Class members have been damaged because they paid copayments for generic prescription drugs that were far higher than the prices they would have paid but for CVS' misconduct.

78.     CVS is therefore liable to plaintiffs and Class members for the damages they sustained.

## <u>COUNT III</u>
## CONSTRUCTIVE FRAUD
### Asserted by the Plaintiffs and the Class against CVS

79.     Plaintiffs repeat paragraphs 1 through 61 above.

80.     In the circumstances alleged above, plaintiffs and Class members had a special relationship with CVS.

81.     In particular, CVS had a duty to deal fairly with plaintiffs and Class members because (a) CVS claimed to possess and did possess specialized knowledge, experience and qualifications regarding the generic prescription drugs it sold to its customers, including

specifically the pricing and scheme for insurance reimbursement of those generic prescription drugs; (b) such specialized knowledge, experience and qualifications put CVS in a position of superiority over plaintiffs and Class Members; (c) CVS knew that plaintiffs and Class members needed to rely and did rely on CVS' specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing generic prescription drugs from CVS, because plaintiffs and Class members were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) plaintiffs and Class members were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at plaintiffs' and Class members' expense if CVS did not supply truthful and accurate information.

82.     CVS breached its duty to deal fairly with plaintiffs and Class members by making material misrepresentations and/or omissions regarding the true usual and customary prices of generic prescription drugs that are set forth on Exhibit 1. CVS made such misrepresentations and/or omissions by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

83.     CVS intended to induce plaintiffs and Class members to rely on its misrepresentations and/or omissions. CVS knew that plaintiffs and Class members would rely on CVS' representation and/or omissions regarding usual and customary prices, and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs set forth on Exhibit 1.

84.     Plaintiffs and Class members justifiably relied upon CVS' misrepresentations and/or omissions in that plaintiffs and Class members would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS'

misrepresentations and/or omissions. Plaintiffs' and Class members' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

85.     CVS gained an advantage at plaintiffs' and Class members' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from plaintiffs and Class members.

86.     As a proximate result of CVS' conduct, plaintiffs and Class members have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

87.     CVS is therefore liable to plaintiffs and Class members for the damages they sustained.

**COUNT IV**
**NEGLIGENT MISREPRESENTATION**
**Asserted by Plaintiffs and the Class against CVS**

88.     Plaintiffs repeat paragraphs 1 through 61 above.

89.     Under the circumstances alleged, CVS owed a duty to plaintiffs and Class members to provide them with accurate information regarding the prices of their generic prescription drugs.

90      CVS misrepresented and/or concealed the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

91.     CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that CVS reported to third-party health plans were substantially and unjustifiably higher than the prices CVS charged uninsured cash-paying customers for the same drugs.

92.     CVS intended to induce plaintiffs and Class members to rely on its misrepresentations and/or omissions. CVS knew that plaintiffs and Class members would rely on CVS' misrepresentations and/or omissions regarding usual and customary prices and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs.

93.     Plaintiffs and Class members justifiably relied upon CVS' misrepresentations and/or omissions in that plaintiffs and Class members would not have purchased generic prescription drugs from CVS for more than the prices for those drugs set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Plaintiffs' and Class members' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

94.     As a proximate result of CVS' negligent conduct, plaintiffs and Class members have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

95.     CVS is therefore liable to plaintiffs and Class members for the damages they sustained.

**COUNT V**
**UNJUST ENRICHMENT**
**Asserted by the Plaintiffs and the Class against CVS**

96.     Plaintiffs repeat paragraphs 1 through 61 above.

97.     By means of CVS' wrongful conduct alleged herein, CVS knowingly charges plan participants artificially high copayments for the generic prescription drugs set forth on Exhibit 1 in a manner that is unfair and unconscionable.

98.     CVS knowingly received and retained wrongful benefits and funds from plaintiffs and Class members. In so doing, CVS acted with conscious disregard for the rights of plaintiffs and Class members.

99.     As a result of CVS' wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, plaintiffs and Class members.

100.    CVS' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

101.    Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on plaintiffs and Class members in an unfair and unconscionable manner. CVS' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

102.    Plaintiffs and Class members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained proceeds.

103.    CVS is therefore liable to plaintiffs and Class members for restitution in the amount of CVS wrongfully obtained profits.

<u>COUNT VI</u>
**VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT
(815 ILCS 505/1 *et seq.*)
Asserted by Plaintiff Podgorny and the Illinois Subclass against CVS**

104.    Plaintiffs repeat paragraphs 1 through 61 above.

103.    Plaintiff Podgorny brings this claim individually and on behalf of the Illinois Subclass.

106.    At all relevant times, CVS was a person within the meaning of 815 ILCS 505/1(c).

107.    At all relevant times, Mr. Podgorny and other members of the Illinois Subclass were consumers within the meaning of 815 ILCS 505/1(e).

108.    At all relevant and material times as described herein, CVS conducted trade and commerce within the meaning of 815 ILCS 505/1(f).

109.    Mr. Podgorny and other members of the Illinois Subclass have suffered losses because of CVS' employment of unconscionable acts or practices and unfair and/or deceptive acts or practices in the conduct of trade and commerce, including, among other things, (a) reporting to third-party health plans fraudulent usual and customary prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party health plans, Mr. Podgorny and other members of the Illinois Subclass that the usual and customary price was greater than Mr. Podgorny's and other members of the Illinois Subclass' copays; (c) concealing from Mr. Podgorny and other members of the Illinois Subclass the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1; and (d) wrongfully obtaining monies from Mr. Podgorny and other members of the Illinois Subclass as a result of its deception.

110.    CVS willfully engaged in the unfair and/or deceptive acts and/or practices described above and knew or should have known that those acts and/or practices were unfair and/or deceptive and in violation of Illinois' Consumer Fraud and Deceptive Business Practices Act.

111.    The facts which CVS misrepresented and/or concealed, as alleged in the preceding paragraphs, were material to Mr. Podgorny's and other members of the Illinois Subclass' decision about whether to purchase generic prescription drugs from CVS, in that they would not have

purchased generic prescription drugs from CVS for more than the prices of those drugs set forth on Exhibit 1, but for CVS' unfair and/or deceptive acts and/or practices.

112. This deception alleged herein occurred in connection with CVS' conduct of trade and commerce in Illinois.

113. CVS intended for Mr. Podgorny and other members of the Illinois Subclass to purchase generic prescription drugs from CVS in reliance upon CVS' unfair and/or deceptive acts and/or practices.

114. As a direct and proximate result of CVS' unfair and deceptive acts and practices, Mr. Podgorny and other members of the Illinois Subclass were deceived into paying artificially inflated prices for the generic prescription drugs set forth on Exhibit 1 and have been damaged thereby.

115. CVS is therefore liable to Mr. Podgorny and other members of the Illinois Subclass for the damages they sustained, plus statutory damages, penalties, costs, and reasonable attorneys' fees to the extent provided by law.

## COUNT VII
### FRAUD
**Asserted by Plaintiff Podgorny and the Illinois Subclass against CVS**

116. Plaintiffs repeat paragraphs 1 through 61 above.

117. Plaintiff Podgorny brings this claim individually and on behalf of the Illinois Subclass.

118. CVS materially misrepresented and/or concealed the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations and/or omissions by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

26

119.     CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party health plans were substantially and unjustifiably higher than the prices CVS charged for uninsured customers paying cash for the same drugs.

120.     CVS intended to induce Mr. Podgorny and other members of the Illinois Subclass to rely on its misrepresentations and/or omissions. CVS knew that Mr. Podgorny and other members of the Illinois Subclass would rely on CVS' representation and/or omissions regarding usual and customary prices and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs.

121.     Mr. Podgorny and other members of the Illinois Subclass justifiably relied upon CVS' misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Mr. Podgorny's and other members of the Illinois Subclass' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

122.     As a proximate result of CVS' conduct, Mr. Podgorny and other members of the Illinois Subclass have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

123.     CVS is therefore liable to Mr. Podgorny and other members of the Illinois Subclass for the damages they sustained.

**COUNT VIII**
**CONSTRUCTIVE FRAUD**
**Asserted by Plaintiff Podgorny and the Illinois Subclass against CVS**

124.     Plaintiffs repeat paragraphs 1 through 61 above.

125.     Plaintiff Podgorny brings this claim individually and on behalf of the Illinois Subclass.

126.     In the circumstances alleged above, Mr. Podgorny and other members of the Illinois Subclass had a special relationship with CVS.

127.     In particular, CVS had a duty to deal fairly with Mr. Podgorny and other members of the Illinois Subclass because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the generic prescription drugs it sold to its customers, including specifically the pricing and scheme for  insurance reimbursement of those generic prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Mr. Podgorny and other members of the Illinois Subclass; (c) CVS knew that Mr. Podgorny and other members of the Illinois Subclass needed to rely and did rely on CVS' specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing generic prescription drugs from CVS, because Mr. Podgorny and other members of the Illinois Subclass were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Mr. Podgorny and other members of the Illinois Subclass were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Mr. Podgorny's and other members of the Illinois Subclass' expense if CVS did not supply truthful and accurate information.

128.     CVS breached its duty to deal fairly with Mr. Podgorny and other members of the Illinois Subclass by making material misrepresentations and/or omissions regarding the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations and/or omissions by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

129.     CVS intended to induce Mr. Podgorny and other members of the Illinois Subclass to rely on its misrepresentations and/or omissions.  CVS knew that Mr. Podgorny and other members of the Illinois Subclass would rely on CVS' representation and/or omissions regarding usual and customary prices and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs.

130.     Mr. Podgorny and other members of the Illinois Subclass justifiably relied upon CVS' misrepresentations and/or omissions in that Mr. Podgorny and other members of the Illinois Subclass would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Mr. Podgorny's and other members of the Illinois Subclass' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

131.     CVS gained an advantage at Mr. Podgorny's and other members of the Illinois Subclass' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Mr. Podgorny and other members of the Illinois Subclass.

132.     As a proximate result of CVS' conduct, Mr. Podgorny and other members of the Illinois Subclass have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

133.     CVS is therefore liable to Mr. Podgorny and other members of the Illinois Subclass for the damages they sustained.

### COUNT IX
### NEGLIGENT MISREPRESENTATION
**Asserted by Plaintiff Podgorny and the Illinois Subclass against CVS**

134.     Plaintiffs repeat paragraphs 1 through 61 above.

135.     Plaintiff Podgorny brings this claim individually and on behalf of the Illinois Subclass.

136.     Under the circumstances alleged, CVS owed a duty to Mr. Podgorny and other members of the Illinois Subclass to provide them with accurate information regarding the prices of their generic prescription drugs.

137.     CVS misrepresented and/or concealed the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

138.     CVS had no reasonable grounds to believe that these misrepresentations and/or omissions were true. The prices that CVS reported to third-party health plans were substantially and unjustifiably higher than the prices CVS charged its uninsured customers paying cash for the same drugs.

139.     CVS intended to induce Mr. Podgorny and other members of the Illinois Subclass to rely on its misrepresentations and/or omissions. CVS knew that Mr. Podgorny and other members of the Illinois Subclass would rely on CVS' misrepresentations and/or omissions regarding usual and customary prices and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs.

140.     Mr. Podgorny and other members of the Illinois Subclass justifiably relied upon CVS' misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Mr. Podgorny's and other members of the Illinois Subclass' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

141.     As a proximate result of CVS' negligent conduct, Mr. Podgorny and other members of the Illinois Subclass have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

142.     CVS is therefore liable to Mr. Podgorny and other members of the Illinois Subclass for the damages they sustained.

## COUNT X
## UNJUST ENRICHMENT
### Asserted by Plaintiff Podgorny and the Illinois Subclass against CVS

143.     Plaintiffs repeat paragraphs 1 through 61 above.

144.     Plaintiff Podgorny brings this claim individually and on behalf of the Illinois Subclass.

145.     By means of CVS' wrongful conduct alleged herein, CVS knowingly charges Mr. Podgorny and other members of the Illinois Subclass artificially high copayments for the generic prescription drugs set forth on Exhibit 1 in a manner that is unfair and unconscionable.

146.     CVS knowingly received and retained wrongful benefits and funds from Mr. Podgorny and other members of the Illinois Subclass. In so doing, CVS acted with conscious disregard for the rights of Mr. Podgorny and other members of the Illinois Subclass.

147.     As a result of CVS' wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Mr. Podgorny and other members of the Illinois Subclass.

148.     CVS' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

149.     Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits they received, and are still receiving, without justification, from the imposition of artificially inflated prices on Mr. Podgorny and other members of the Illinois Subclass in an unfair and unconscionable manner. CVS' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

150.     Mr. Podgorny and other members of the Illinois Subclass did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

151.     CVS is therefore liable to Mr. Podgorny and other members of the Illinois Subclass for restitution in the amount of CVS' wrongfully obtained profits.

<u>**COUNT XI**</u>
**VIOLATION OF THE PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW**
**(73 Penn. Stat. Ann. § 201–1, *et seq.*)**
**Asserted by Plaintiff Cauley and the Pennsylvania Subclass against CVS**

152.     Plaintiffs repeat paragraphs 1 through 61 above.

153.     Plaintiff Cauley brings this claim individually and on behalf of the Pennsylvania Subclass.

154.     CVS is a "person" within the meaning of § 201–2(2).

155.     CVS engaged in "trade" and "commerce" within the meaning of § 201–2(3).

156.     Mr. Cauley and other members of the Pennsylvania Subclass have been injured by CVS' deceptive practices in violation of § 201–2(4), including, among other things, (a) reporting to third-party health plans fraudulent usual and customary prices for hundreds of generic prescription drugs; (b) misrepresenting to third-party health plans, Mr. Cauley and other members of the Pennsylvania Subclass that the usual and customary price was greater than Mr. Cauley's

and other members of the Pennsylvania Subclass' copayments; (c) concealing from Mr. Cauley and other members of the Pennsylvania Subclass the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1; and (d) wrongfully obtaining monies from Mr. Cauley and the other members of the Pennsylvania Subclass as a result of its deception.

157.    These misrepresentations and concealments specifically violated § 201–2(4)(ii), § 201–2(4)(iii), § 201–2(4)(v), § 201–2(4)(vii), and § 201–2(4)(xxi).

158.    CVS willfully, knowingly, and fraudulently engaged in the deceptive acts and/or practices described above.

159.    As a direct and proximate result of CVS' unfair and deceptive acts and practices, Mr. Cauley and the other members of the Pennsylvania Subclass were deceived into paying artificially inflated prices for the generic prescription drugs set forth on Exhibit 1 and have been damaged thereby.

160.    CVS is therefore liable to Mr. Cauley and other members of the Pennsylvania Subclass for the damages they sustained, plus statutory damages, penalties, costs and reasonable attorneys' fees to the extent provided by law.

<u>**COUNT XII**</u>
**FRAUD**
**Asserted by Plaintiff Cauley and the Pennsylvania Subclass against CVS**

161.    Plaintiffs repeat paragraphs 1 through 61 above.

162.    Plaintiff Cauley brings this claim individually and on behalf of the Pennsylvania Subclass.

163.    CVS materially misrepresented and/or concealed the true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations

and/or omissions by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

164.    CVS made these misrepresentations and omissions knowingly, or at least with reckless disregard of their falsity, given that CVS knew the prices that CVS reported to third-party health plans were substantially and unjustifiably higher than the prices CVS charged to uninsured customers paying cash for the same drugs.

165.    CVS intended to induce Mr. Cauley and the other members of the Pennsylvania Subclass to rely on its misrepresentations and/or omissions. CVS knew that Mr. Cauley and the other members of the Pennsylvania Subclass would rely on CVS' representation and/or omissions regarding usual and customary prices and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs.

166.    Mr. Cauley and the other members of the Pennsylvania Subclass justifiably relied upon CVS' misrepresentations and/or omissions in that Mr. Cauley and the other members of the Pennsylvania Subclass would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Mr. Cauley's and the other members of the Pennsylvania Subclass' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

167.    As a proximate result of CVS' conduct, Mr. Cauley and the other members of the Pennsylvania Subclass have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

168.    CVS is therefore liable to Mr. Cauley and the other members of the Pennsylvania Subclass for the damages they sustained.

## COUNT XIII
## CONSTRUCTIVE FRAUD
### Asserted by Plaintiff Cauley and the Pennsylvania Subclass against CVS

169.    Plaintiffs repeat paragraphs 1 through 61 above.

170.    Plaintiff Cauley brings this claim individually and on behalf of the Pennsylvania Subclass.

171.    In the circumstances alleged above, Mr. Cauley and the other members of the Pennsylvania Subclass had a special relationship with CVS.

172.    In particular, CVS had a duty to deal fairly with Mr. Cauley and the other members of the Pennsylvania Subclass because (a) CVS claimed to possess and did possess specialized knowledge, experience, and qualifications regarding the generic prescription drugs it sold to its customers, including specifically the pricing and scheme for insurance reimbursement of those generic prescription drugs; (b) such specialized knowledge, experience, and qualifications put CVS in a position of superiority over Mr. Cauley and the other members of the Pennsylvania Subclass; (c) CVS knew that Mr. Cauley and the other members of the Pennsylvania Subclass needed to rely and did rely on CVS' specialized knowledge, experience and qualifications, and on information supplied by CVS, in making decisions on purchasing generic prescription drugs from CVS, because they were not able to detect the falsity and incompleteness of the information supplied by CVS; (d) Mr. Cauley and the other members of the Pennsylvania Subclass were uniquely vulnerable to injury if CVS did not supply truthful and accurate information; and (e) CVS stood to gain at Mr. Cauley's and the other members of the Pennsylvania Subclass' expense if CVS did not supply truthful and accurate information.

173.    CVS breached its duty to deal fairly with Mr. Cauley and the other members of the Pennsylvania Subclass by making material misrepresentations and/or omissions regarding the

true usual and customary prices of the generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations and/or omissions by reporting artificially inflated usual and customary prices for such drugs to third-party health plans.

174. CVS intended to induce Mr. Cauley and the other members of the Pennsylvania Subclass to rely on its misrepresentations and/or omissions. CVS knew that Mr. Cauley and the other members of the Pennsylvania Subclass would rely on CVS' representation and/or omissions regarding usual and customary prices and, as a result, would pay copayments higher than the actual usual and customary prices for those generic prescription drugs.

175. Mr. Cauley and the other members of the Pennsylvania Subclass justifiably relied upon CVS' misrepresentations and/or omissions in that they would not have purchased generic prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Mr. Cauley's and the other members of the Pennsylvania Subclass' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

176. CVS gained an advantage at Mr. Cauley's and the other members of the Pennsylvania Subclass' expense, as alleged above, because, among other things, CVS obtained wrongfully inflated copayments from Mr. Cauley and the other members of the Pennsylvania Subclass.

177. As a proximate result of CVS' conduct, Mr. Cauley and the other members of the Pennsylvania Subclass have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

178. CVS is therefore liable to Mr. Cauley and the other members of the Pennsylvania Subclass for the damages they sustained.

**COUNT XIV**
**NEGLIGENT MISREPRESENTATION**
**Asserted by Plaintiff Cauley and the Pennsylvania Subclass against CVS**

179.    Plaintiffs repeat paragraphs 1 through 61 above.

180.    Plaintiff Cauley brings this claim individually and on behalf of the Pennsylvania

Subclass.

181.    Under the circumstances alleged, CVS owed a duty to Mr. Cauley and the other

members of the Pennsylvania Subclass to provide them with accurate information regarding the

prices of their generic prescription drugs.

182.    CVS misrepresented and/or concealed the true usual and customary prices of the

generic prescription drugs set forth on Exhibit 1. CVS made such misrepresentations and/or

omissions by reporting artificially inflated usual and customary prices for such drugs to third-

party health plans.

183.    CVS had no reasonable grounds to believe that these misrepresentations and/or

omissions were true. The prices that CVS reported to third-party health plans were substantially

and unjustifiably higher than the prices CVS charged to uninsured customers paying cash for the

same drugs.

184.    CVS intended to induce Mr. Cauley and the other members of the Pennsylvania

Subclass to rely on its misrepresentations and/or omissions. CVS knew that Mr. Cauley and the

other members of the Pennsylvania Subclass would rely on CVS' representation and/or omissions

regarding usual and customary prices and, as a result, would pay copayments higher than the

actual usual and customary prices for those generic prescription drugs.

185.    Mr. Cauley and the other members of the Pennsylvania Subclass justifiably relied

upon CVS' misrepresentations and/or omissions in that they would not have purchased generic

prescription drugs from CVS for more than the prices set forth on Exhibit 1, but for CVS' misrepresentations and/or omissions. Mr. Cauley's and the other members of the Pennsylvania Subclass' reliance on CVS' misrepresentations and/or omissions was, thus, to their detriment.

186.    As a proximate result of CVS' negligent conduct, Mr. Cauley and the other members of the Pennsylvania Subclass have been damaged because they paid copayments for the generic prescription drugs set forth on Exhibit 1 that were far higher than the prices they would have paid but for CVS' misconduct.

187.    CVS is therefore liable to Mr. Cauley and the other members of the Pennsylvania Subclass for the damages they sustained.

## COUNT XV
## UNJUST ENRICHMENT
### Asserted by Plaintiff Cauley and the Pennsylvania Subclass against CVS

188.    Plaintiffs repeat paragraphs 1 through 61 above.

189.    Plaintiff Cauley brings this claim individually and on behalf of the Pennsylvania Subclass.

190.    By means of CVS' wrongful conduct alleged herein, CVS knowingly charges Mr. Cauley and the other members of the Pennsylvania Subclass an artificially high copayment for the generic prescription drugs set forth on Exhibit 1 in a manner that is unfair and unconscionable.

191.    CVS knowingly received and retained wrongful benefits and funds from Mr. Cauley and the other members of the Pennsylvania Subclass. In so doing, CVS acted with conscious disregard for the rights of Mr. Cauley and the other members of the Pennsylvania Subclass.

192.     As a result of CVS' wrongful conduct as alleged herein, CVS has been unjustly enriched at the expense of, and to the detriment of, Mr. Cauley and the other members of the Pennsylvania Subclass.

193.     CVS' unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

194.     Under the common law doctrine of unjust enrichment, it is inequitable for CVS to be permitted to retain the benefits it received, and is still receiving, without justification, from the imposition of artificially inflated prices on Mr. Cauley and the other members of the Pennsylvania Subclass in an unfair and unconscionable manner. CVS' retention of such funds under circumstances making it inequitable to do so constitutes unjust enrichment.

195.     Mr. Cauley and the other members of the Pennsylvania Subclass did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for CVS to retain these wrongfully obtained profits.

196.     CVS is therefore liable to Mr. Cauley and the other members of the Pennsylvania Subclass for restitution in the amount of CVS' wrongfully obtained profits.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs and the other members of the Class and Subclasses request judgment against CVS as follows:

A.     An order certifying the Class and Subclasses, directing that this case proceed as a class action, and appointing plaintiffs and their counsel to represent plaintiffs and the Class and Subclasses;

B.     Judgment in favor of plaintiffs and the Class and Subclasses in an amount of actual damages, statutory damages, disgorgement, or restitution to be determined at trial;

39

C.    An order enjoining CVS from continuing to engage in the fraudulent and deceptive acts described above;

D.    An order granting reasonable attorneys' fees and costs, as well as pre- and post-judgment interest at the maximum legal rate; and

E.    Such other and further relief as this Court may deem appropriate.

<strong>DEMAND FOR JURY TRIAL</strong>

Plaintiffs and the Class and Subclasses demand a jury trial on all claims.

DATED: September 17, 2015                    Respectfully submitted,

By:      /s/    Clinton A. Krislov

Clinton A. Krislov (#153433)
Christopher M. Hack (#6304773)
**KRISLOV & ASSOCIATES, LTD.**
Civic Opera Building, Suite 1300
20 North Wacker Drive
Chicago, Illinois 60606
Telephone: 312-606-0500
Facsimile: 312-739-1098
Email: clint@krislovlaw.com
          chris@krislovlaw.com

Elizabeth C. Pritzker
Jonathan K. Levine
Shiho Yamamoto
**PRITZKER LEVINE LLP**
180 Grand Avenue, Suite 1390
Oakland, California 94612
Telephone: 415-692-0772
Facsimile: 415-366-6110
Email: ecp@pritzkerlevine.com;
          jkl@pritzkerlevine.com;
          sy@pritzkerlevine.com

*Attorneys for Plaintiffs and the Putative Class*